# United States Court of Appeals
## For the First Circuit

No. 03-2647

DONALD L. CARCIERI, in his capacity as Governor of the State of
Rhode Island; STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, a
sovereign State of the United States; TOWN OF CHARLESTOWN, RHODE
ISLAND,

Plaintiffs, Appellants,

v.

DIRK KEMPTHORNE,* in his capacity as Secretary of the Department
of the Interior, United States; FRANKLIN KEEL, in his capacity as
Eastern Area Director of the Bureau of Indian Affairs, within the
Department of Interior, United States,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
Selya, Senior Circuit Judge,
Lynch, Lipez, and Howard, Circuit Judges.

Claire Richards, Special Counsel, for appellant Donald L.
Carcieri.
Stephen P. Collette and Stephen P. Collette & Associates on
brief for National Coalition Against Gambling Expansion, amicus
curiae.

---

* Defendant Gale A. Norton has been substituted with Dirk
Kempthorne. See Fed. R. App. P. 43(c)(2).

Neil F.X. Kelly, Assistant Attorney General, with whom Patrick C. Lynch, Attorney General, was on brief, for appellant State of Rhode Island.

Troy King, Attorney General for the State of Alabama, Talis J. Colberg, Attorney General for the State of Alaska, Richard Blumenthal, Attorney General for the State of Connecticut, Susan Quinn Cobb, Assistant Attorney General for the State of Connecticut, Lawrence G. Wasden, Attorney General for the State of Idaho, Paul J. Morrison, Attorney General for the State of Kansas, Jeremiah W. (Jay) Nixon, Attorney General for the State of Missouri, Wayne Stenehjem, Attorney General for the State of North Dakota, Larry Long, Attorney General for the State of South Dakota, John P. Guhin, Assistant Attorney General for the State of South Dakota, Mark L. Shurtleff, Attorney General for the State of Utah, and William H. Sorrell, Attorney General for the State of Vermont, on brief for the States of Alabama, Alaska, Connecticut, Idaho, Kansas, Missouri, North Dakota, South Dakota, Utah, and Vermont, amici curiae.

Joseph S. Larisa, Jr., Assistant Solicitor for Indian Affairs, for appellant Town of Charlestown.

Elizabeth Ann Peterson, Attorney, Environment and Natural Resources Division, United States Department of Justice, with whom Thomas L. Sansonetti, Assistant Attorney General, Jeffrey Bossert Clark and Ryan D. Nelson, Deputy Assistant Attorneys General, William B. Lazarus, Judith Rabinowitz, and David C. Shilton, Attorneys, Environment and Natural Resources Division, United States Department of Justice, and Mary Anne Kenworthy, Office of the Solicitor, United States Department of the Interior, were on brief, for appellees.

Ian Heath Gershengorn, with whom Sam Hirsch, Jenner & Block LLP, John Dossett, Riyaz A. Kanji, Kanji & Katzen PLLC, Tracy Labin, Richard Guest, and Native American Rights Fund were on brief, for National Congress of American Indians, Absentee Shawnee Tribe, Akiak Native Community, Cahto Tribe of the Laytonville Rancheria, Cheyenne River Sioux Tribe, Coeur d'Alene Tribe, Confederated Salish and Kootenai Tribes of the Flathead Nation, Confederated Tribes of the Warm Springs Reservation of Oregon, Eastern Pequot Tribal Nation, Eastern Shawnee Tribe of Oklahoma, Ely Shoshone Tribe, Fallon Paiute-Shoshone Tribe, Ft. McDermitt Paiute-Shoshone Tribe, Grand Traverse Band of Ottawa and Chippewa Indians, Inupiat Community of Arctic Slope (IRA), Kenaitze Indian Tribe, IRA, Kickapoo Tribe in Kansas, Lac Courte Oreilles Band of Lake Superior Chippewa, Lovelock Paiute Tribe, Lummi Nation, Moapa Paiute Band of the Moapa Indian Reservation, Modoc Tribe of Oklahoma, Narragansett Indian Tribe of Rhode Island, Native Village of Venetie IRA Tribal Government, Nez Perce Tribe, Oglala Sioux Tribe, Oneida Tribe of Indians of Wisconsin, Prairie Band of Potawatami Nation, Pueblo of Laguna, Pueblo of Santa Ana, Pueblo of Taos, Seminole Tribe of Florida, Shoshone-Paiute Tribes of the Duck Valley Reservation, Sisseton-Wahpeton Oyate of the Lake Traverse

Reservation, St. Regis Mohawk Tribe, Suquamish Tribe, Tanana Chiefs Conference, Te-Moak Tribe of Western Shoshone Indians, Tuolumne Band of Me-Wuk Indians, United South and Eastern Tribes, Inc., Washoe Tribe of Nevada and California, and Yomba Shoshone Tribe, amici curiae.

C. Bryant Rogers, Roth, VanAmberg, Rogers, Ortiz & Yepa, LLP, Charles A. Hobbs, Hobbs, Straus, Dean & Walker, LLP on brief for Mississippi Band of Choctaw Indians, amicus curiae.

---

EN BANC OPINION
July 20, 2007

---

**LYNCH**, **Circuit Judge**.  The en banc court has convened to consider a series of issues concerning the relative powers of the federal Secretary of the Interior, the State of Rhode Island, and the Narragansett Tribe over a parcel of land taken into trust and designated for Indian housing.  The case is in many ways a proxy for the State's larger concerns about its sovereignty vis-à-vis federal and tribal control over lands within the state.

In 1998, the Secretary of the Interior agreed to take into unreserved trust for the Tribe's benefit a 31- or 32-acre parcel in Charlestown, Rhode Island (the Parcel).  Then-Secretary Gale Norton cited her powers under section 5 of the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465.  The Tribe had purchased the Parcel in 1991.

Under the Indian Commerce Clause of the Constitution, U.S. Const. art. I, § 8, cl. 3, Congress has plenary power to legislate on the subject of Indian tribes.  Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989).  As a result, Congress may preempt the operation of state law in Indian country.  See New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333 (1983).  Under section 5 of the IRA, Congress has authorized the Secretary "in his discretion" to acquire and take into trust for Indian tribes "any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians."  25 U.S.C.

§ 465.  The Secretary may take land into trust for these purposes, as was done here, without the consent of the State.[1]

The Secretary's acquisition of land into trust for Indians results in the land becoming "Indian country."  18 U.S.C. § 1151.  Generally speaking, primary jurisdiction over land that is Indian country rests with the federal government and the Indian tribe inhabiting it, not with the state.  Alaska v. Native Vill. of Venetie Tribal Gov't, 522 U.S. 520, 527 n.1 (1988).  To be more precise,

> "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest."  When, however, state interests outside the reservation are implicated, States [sometimes] may regulate the activities even of tribe members on tribal land . . . .

Nevada v. Hicks, 533 U.S. 353, 362 (2001) (citation omitted) (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 144 (1980)).

Recognizing a conflict between state jurisdiction and the federal interest in encouraging tribal self-governance, the Secretary's regulations under the IRA provide that "none of the laws . . . of any State . . . limiting, zoning or otherwise

---

[1]     By contrast, the Indian Gaming Regulatory Act provides the State with a limited role in determining whether land is taken into trust for gaming purposes.  See 25 U.S.C. § 2719(b)(1)(A).

-5-

governing, regulating, or controlling the use or development of any real or personal property . . . shall be applicable" to land held in trust for a tribe by the United States.  25 C.F.R. § 1.4(a). This provision is subject to the Secretary's power in specific cases or areas to make applicable those local laws determined to be in the best interest of the Indian owners "in achieving the highest and best use of [the] property."  Id. § 1.4(b).

Concerned over the loss of sovereignty over the Parcel and what it may portend for the future, the State, its Governor, and the town of Charlestown (collectively, the State), sued the Secretary of the Interior, now Dirk Kempthorne, and the Regional Director of the Bureau of Indian Affairs (BIA), Franklin Keel, in federal court.  See Carcieri v. Norton, 290 F. Supp. 2d 167 (D.R.I. 2003).  Having exhausted administrative remedies, the State brought suit under the Administrative Procedure Act, 5 U.S.C. § 702, seeking review of the Secretary's decision to take the Parcel into trust.  Id. at 169, 172.

The State's case asserts three major theories.  First, the State argues that the IRA does not authorize the Secretary to take land into trust for any tribe, including the Narragansetts, that first received federal recognition after June 18, 1934, the effective date of the IRA.  Second, the State argues that the 1978 Rhode Island Indian Claims Settlement Act (the Settlement Act), 25 U.S.C. §§ 1701-1716, restricts the Secretary's authority to place

the Parcel into trust pursuant to the IRA.  Third, the State argues that the Constitution prohibits this exercise of authority by the Secretary.[2]

As to the IRA, the State argues that the Narragansetts do not meet the definition of "Indian" contained in 25 U.S.C. § 479. The pertinent definition recognizes, inter alia, "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction."  25 U.S.C. § 479 (emphasis added). The State reads "are members . . . now under Federal jurisdiction" to plainly and literally mean the 1934 effective date of the IRA. The State thus contends that the Secretary has no authority under the IRA to take land into trust for any tribe that was not federally recognized in 1934.  As a result, the State argues, the Secretary is precluded entirely from placing the Parcel into trust for the Narragansetts, who were not recognized as a tribe until 1983.

Next, the State argues that the terms of the Settlement Act preclude the Secretary from placing the Parcel into trust

---

[2]     The State's challenges to the Secretary's authority under the IRA and the Constitution have national implications that reach beyond Rhode Island; accordingly, ten states and the National Coalition Against Gambling Expansion have filed amicus briefs in support of Rhode Island.  Similarly, numerous tribes and tribal organizations have filed amicus briefs in support of the Secretary. We acknowledge the able assistance provided by the amici curiae states and National Coalition Against Gambling Expansion on behalf of the State, and amici curiae National Congress of American Indians, individual Indian tribes and tribal organizations, and the Mississippi Band of Choctaw Indians on behalf of the Secretary.

because the Settlement Act is a later specific act of Congress that must be read to have explicitly and implicitly cabined the Tribe's and the Secretary's power as to the Parcel. The State argues that the Settlement Act bars the imposition of any trust. The State's fallback position is that any trust must be restricted by the terms of the Settlement Act so that it is clear that state and local law apply to the Parcel, just as they do to the settlement lands.

Finally, the State asserts various constitutional theories, with the common underpinning that the placing of the Parcel into trust violates the State's sovereignty. The State argues that the Indian Commerce Clause does not authorize the Secretary's exercise of power and that the exercise violates the Tenth Amendment, as well as the Enclave and Admissions Clauses of the Constitution. The State also argues that section 5 of the IRA, 25 U.S.C. § 465, constitutes an unconstitutional delegation of legislative authority.

We hold that the language of 25 U.S.C. § 479 does not plainly refer to the 1934 enactment date of the IRA. We find that the text is sufficiently ambiguous in its use of the term "now" that the Secretary has, under the <u>Chevron</u> doctrine, authority to construe the Act. We reject the State's claim that we do not owe deference to the Secretary's interpretation because he has inconsistently interpreted or applied section 479. The State's evidence of inconsistency is mixed and is not persuasive. The

Secretary's position has not been inconsistent, much less arbitrary. The Secretary's interpretation is rational and not inconsistent with the statutory language or legislative history, and must be honored.

Likewise, the Settlement Act neither explicitly bars by its terms the Secretary's actions, nor implicitly repeals or constrains the Secretary's authority under the IRA to place land into trust for the Tribe. While the State apparently failed to anticipate this particular problem at the time of the settlement, the Settlement Act did specifically contemplate the event of federal recognition of the Tribe and did not restrict the Secretary's power, should the Tribe be recognized, to take into trust land outside of the settlement lands. We are not free to reform the Act. If aggrieved, the State must turn to Congress.

The State's arguments based on allocations of power under the U.S. Constitution also do not prevail. They do, however, underscore the seriousness of the State's concern about the abrogation of state sovereignty at stake here.

I.

In order to understand the nature of the controversy and the consequences of this decision, a brief recounting of the history of relations between the State and the Tribe is required. Further background can be found in the district court's opinion, Carcieri, 290 F. Supp. 2d 167, as well as the opinions previously

-9-

issued in the decades-long disputes between the State and the Tribe, see Narragansett Indian Tribe v. Rhode Island (Narragansett III), 449 F.3d 16 (1st Cir. 2006) (en banc); Narragansett Indian Tribe v. Narragansett Elec. Co. (Narragansett II), 89 F.3d 908 (1st Cir. 1996); Rhode Island v. Narragansett Indian Tribe (Narragansett I), 19 F.3d 685 (1st Cir. 1994).

In 1880, the State acquired the majority of the Tribe's lands. In 1934, the Tribe organized as a state-chartered corporation. In 1975, the Tribe sued to recover its lands, arguing that the State had acquired the lands in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177. The Tribe claimed that this violation rendered void the transfer of title to the lands.

This cloud on title prompted the State to enter into settlement negotiations with the Tribe, which led in 1978 to an agreement embodied in a Joint Memorandum of Understanding (JMOU). Under the JMOU, the Tribe would receive 1800 acres of "settlement lands," half of which were provided by the State and half of which were purchased with federal funds. The State agreed to create an Indian-controlled corporation to hold the settlement lands in trust for the Tribe, to exempt the settlement lands from local taxation, and to help secure the federal legislation necessary to implement the agreement. In exchange, the Tribe abandoned its claims of aboriginal title and its claims to lands in the state other than the settlement lands.

In turn, Congress approved and codified the agreement in the Settlement Act. The Settlement Act provided that "the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." Id. § 1708(a).

Five years later, in 1983, the Secretary granted the Tribe official federal recognition. See Final Determination for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island, 48 Fed. Reg. 6177 (Feb. 10, 1983). Following that recognition, in 1985, Rhode Island amended the pertinent state statute to permit the conveyance of the settlement lands directly to the Tribe, explicitly preserving the State's jurisdiction over the settlement lands, consistent with the Settlement Act, 25 U.S.C. § 1708(a). See R.I. Gen. Laws § 37-18-13(b). The holding company conveyed the settlement lands to the Tribe, and three years later, the Tribe conveyed the settlement lands to the BIA as trustee. The trust deed confirmed the application of state law to the settlement lands, as provided in 25 U.S.C. § 1708(a). The BIA continues to hold the settlement lands in trust for the Tribe, subject to this congressionally-enacted restriction that state law applies. See Narragansett I, 19 F.3d at 689, 695 n.8. Significantly, in our earlier en banc decision in Narragansett III, we held that the language of section 1708(a) trumped any residual tribal sovereignty

over the settlement lands, under which the Tribe had refused to comply with certain state laws.[3]  See 449 F.3d at 26.

Then, in 1991, the tribal housing authority purchased the Parcel in fee simple, acquiring title through purchase from a private developer.  The Parcel was part of the Tribe's aboriginal lands claimed in the 1976 lawsuit.  Under the Settlement Act, the Tribe had thus relinquished aboriginal title to the Parcel, but the Parcel is not part of the 1800 acres of settlement lands.  It is adjacent to the settlement lands, across a town road.  In 1992, the Housing Authority transferred the Parcel to the Tribe with a deed restriction that the Parcel be placed in trust with the BIA for the purpose of providing housing.

A dispute soon arose over whether development of the Parcel had to comply with local law.  The Tribe began construction on the planned housing project without obtaining a building permit from the Town or the State's approval of the individual sewage disposal systems.  The Tribe essentially took the position that once it had purchased the Parcel, the land had become tribal land, and the Tribe's inherent sovereignty meant that the Parcel was exempt from local law.  The State disagreed and filed suit in federal court to enjoin the Tribe.  See Narragansett Indian Tribe

---

[3]     In "an abundance of caution," we recognized that the Tribe may still possess some autonomy in local government matters such as membership rules, inheritance rules, and regulation of domestic relations.  Narragansett III, 449 F.3d at 26.

v. Narragansett Elec. Co., 878 F. Supp. 349 (D.R.I. 1995). Ultimately, the Tribe lost that litigation.[4] See Narragansett II, 89 F.3d at 922.

The Tribe had sought to solve the issue of the applicability of state law to the Parcel by applying to the Secretary in 1993 to have the Parcel taken into trust under section 5 of the IRA. The Secretary's determination of whether to do so was stayed pending the resolution of the federal court litigation. After the litigation was resolved against the Tribe by this court in 1996, id. at 922, the Tribe submitted a second application to the Secretary.

The Tribe filed this updated application with the Secretary in July 1997. In determining whether to take lands into

---

[4] The Housing Authority was a duly recognized Indian housing authority and was given HUD funds to finance the purchase of the property and the construction of approximately 50 units of housing. See Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ff (repealed by Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. §§ 4101-4243).

The district court found the proposed housing project could be detrimental to coastal and groundwater resources, but also held that the Parcel was a "dependent Indian community" within the meaning of 18 U.S.C. § 1151(b) and therefore partially denied injunctive relief. Narragansett Elec. Co., 878 F. Supp. at 355-57, 366. On appeal, this court held that the land for the housing project was not a "dependent Indian community" because federal ownership of the land and federal action to "set aside" the land were lacking. Narragansett II, 89 F.3d at 921-22. Thus, the Parcel could not be considered Indian country under 18 U.S.C. § 1151(b), and the housing project being constructed on the site was not exempt from state and local building and zoning restrictions. Accordingly, this court reversed the district court and directed the district court to enter an order granting the injunction. 89 F.3d at 922.

trust, the Secretary follows a regulatory process set forth at 25 C.F.R. part 151, which requires consideration of several factors. If, as here, the land is off reservation, additional criteria apply. See 25 C.F.R. § 151.11. Generally, the farther from a reservation the land is, the greater the scrutiny the Secretary gives to the justification of anticipated benefits from the acquisition. See id. § 151.11(e); see also M.J. Sheppard, Taking Indian Land into Trust, 44 S.D. L. Rev. 681, 686 (1999).

On March 6, 1998, the BIA notified the State of the Secretary's intent to take the Parcel into trust for the Tribe. The State appealed the decision to the Interior Board of Indian Appeals (IBIA). The State argued, inter alia, that the Settlement Act prohibited this action by the Secretary, and that in taking the land into trust without the State's consent, the Secretary had acted unconstitutionally. The IBIA affirmed the BIA's determination on June 29, 2000. Town of Charlestown v. E. Area Dir., Bureau of Indian Affairs, 35 I.B.I.A. 93, 106 (2000). It noted it had no jurisdiction over the claims of unconstitutionality.[5] Id. at 97.

---

[5] The IBIA rejected the State's insistence that the Secretary take account of the potential use of the Parcel for gaming purposes under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, calling such a possibility merely speculative. 35 I.B.I.A. at 103. The IBIA also concluded that there had been no violation of the Coastal Zone Management Act, 16 U.S.C. § 1451. 35 I.B.I.A. at 103.

-14-

The State then instituted this action in federal court. The district court, in a comprehensive decision, rejected the State's claims. See Carcieri, 290 F. Supp. 2d 167. A divided panel of this court affirmed. Carcieri v. Norton, 423 F.3d 45 (1st Cir. 2005). The en banc court granted rehearing and withdrew the panel opinion.

As described above and recounted in our en banc decision in Narragansett III, 449 F.3d at 18-21, for several decades the relationship between the Tribe and the State has been fraught with tension.

The State's short-term concerns in this case have to do with whether the particular project will conform with state and local law. The State also has concerns that once land is taken into trust, there will be very few mechanisms, other than negotiation with the Tribe or appeal to the Secretary's authority under 25 C.F.R. § 1.4(b), by which the State may secure compliance with state and local laws.[6] The State fears that the Tribe will

---

[6]     At oral argument, the Secretary indicated that although a tribe has civil regulatory jurisdiction over lands taken into trust, a state may seek to enforce its laws -- to the extent they are not preempted by federal law -- on trust lands either by agreement with the tribe or by seeking a determination in federal court that the State's interests with respect to enforcing a particular regulation outweigh the interests of the tribe and the federal government in fostering tribal self-government. See Hicks, 533 U.S. at 362 ("When . . . state interests outside the reservation are implicated, States [sometimes] may regulate the activities even of tribe members on tribal land."); see also id. at 364 (holding that state officers may execute on tribal lands process related to off-reservation violations of state law);

-15-

convert or otherwise use the Parcel, or any future parcels that might be acquired and put into trust, for income-producing activities in which it normally would not be permitted to engage under state law.

There has been federal litigation between state officials and the Tribe and its members over such activities. In 2003, the Tribe, seeking revenue, established on the settlement lands an Indian Smoke Shop that sold cigarettes without purchasing state cigarette stamps or collecting sales taxes then paid to the State, as required by state law. The State Police raided the smoke shop and initiated criminal prosecutions against tribe members. The Tribe sought a declaratory judgment in federal court asserting that its control over the smoke shop was an inherent function of tribal sovereignty that survived the Settlement Act, despite the explicit language in section 1708(a). We rejected that claim en banc. Narragansett III, 449 F.3d at 30-31.

II.

A.      Standard of Review

Technically, the claims at issue here are reviewed through the lens of an APA appeal under 5 U.S.C. § 706. Our review of such an appeal is de novo as to the district court's conclusions. See Harvey v. Veneman, 396 F.3d 28, 33 (1st Cir.

_____

Confederated Tribes, 447 U.S. at 151 (explaining that the state could require Indian tribes to collect taxes on sales of cigarettes to non-Indians). That issue is beyond the scope of this opinion.

-16-

2005).  The underlying issues remaining in the case are statutory and constitutional.  Statutory issues are reviewed de novo by the courts, but subject to established principles of deference to the administering agency.  Id.  Constitutional claims are reviewed de novo.  See Cousins v. Sec'y of Transp., 880 F.2d 603, 610 (1st Cir. 1989) (en banc).

B.        The 1934 Indian Reorganization Act

The State argues that the Secretary lacks authority to place the Parcel into trust under 25 U.S.C. § 465 since, under the definition of "Indian" in 25 U.S.C. § 479, that authority extends only to tribes that were both federally "recognized" and "under [f]ederal jurisdiction" on June 18, 1934, the effective date of the IRA.

The State presents a series of cascading arguments. First, the State argues that the plain language of section 479 is clear, and that under that plain language, the Tribe's status is measured as of 1934.  The State further argues that its interpretation of the statute is the only one consistent with the purposes and legislative history of the Act.  Thus, the State argues that because the statute is unambiguous, deference to the Secretary is unwarranted.  In any event, the State argues that even if deference might have been warranted, the Secretary's current interpretation is not entitled to deference because it contradicts

-17-

the Secretary's practice in the more than seventy years since the passage of the IRA.

1.    Chevron Analysis

The Secretary has offered an interpretation of the IRA that permits trust acquisitions for tribes recognized and under federal jurisdiction at the time the request for a trust acquisition is made.  A court reviewing an agency's interpretation of a statute that it administers engages in a two-step analysis. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  We must first consider "whether Congress has directly spoken to the precise question at issue." Id. at 842.  If congressional intent is clear, we "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43.  "[I]f the statute is silent or ambiguous with respect to the specific issue," however, we must consider "whether the agency's [interpretation] is based on a permissible construction of the statute."  Id. at 843.

(a)  Whether Section 479 Is Ambiguous

We begin our analysis with the statutory text.  Rucker v. Lee Holding Co., 471 F.3d 6, 9 (1st Cir. 2006).  The language at issue is that contained in 25 U.S.C. § 479, which provides:

> The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present

-18-

> boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood.

One might have an initial instinct to read the word "now" in the statute as the State does, to mean the date of enactment of the statute, June 18, 1934. Congress certainly has used the word "now" in this way. See, e.g., Montana v. Kennedy, 366 U.S. 308, 312 (1961) (interpreting the word "now" in a reenactment of an earlier act to refer to the initial date of enactment).

Any such instinct quickly disappears upon further examination, however. This is not a case that can be resolved by looking to the plain meaning of the term "now" standing by itself. "Now" means "at the present time," but there is ambiguity as to whether to view the term "now" as operating at the moment Congress enacted it or at the moment the Secretary invokes it. Indeed, Congress sometimes uses the word "now" to refer to a time other than the moment of enactment. See Difford v. Sec'y of Health & Human Servs., 910 F.2d 1316, 1320 (6th Cir. 1990) (interpreting the word "now" in a disability benefits termination provision to refer to the time of the hearing); see also Pierce v. Pierce, 287 N.W.2d 879, 882 (Iowa 1980) (noting that the phrase "now hav[ing] jurisdiction" in the Uniform Child Custody Jurisdiction Act "refers to the time of the filing of the petition"); cf. Williams v. Ragland, 567 So. 2d 63, 65-66 (La. 1990) (declining to interpret "now serving" in a mandatory judicial retirement provision to refer

to the date of enactment).  There also are other layers of ambiguity.

Given that the word "now" does not itself have a clear meaning, we must look to context.  Here, the context is equivocal. On the one hand, the State points to 25 U.S.C. § 472, another provision of the IRA, which refers to "positions maintained, now or hereafter, by the Indian Office."  The State argues that this use of "now" unambiguously refers to the date of enactment and that had Congress wanted to include later-recognized tribes in section 479, it would have similarly added the words "or hereafter."

On the other hand, the Secretary points out that section 479 itself specifies the date of "June 1, 1934" as the relevant date for determining eligibility based on "residing within the present boundaries of any Indian reservation."  The Secretary thus counters that had Congress wanted to require recognition of a tribe on the date of enactment, it would have specified that date, rather than using the term "now."  See also 25 U.S.C. § 478 (requiring elections to be held "within one year after June 18, 1934"). Hence, "now" might mean "now or hereafter" or it might mean "June 18, 1934"; either would be consistent with some other part of the statute.

Policy does not provide an obvious answer either: each side has a plausible explanation that policy considerations favor its interpretation.  The State argues that the principal, perhaps

exclusive, concern of the 1934 statute was with remedying the perceived ills of the prior practice of allotment. See Kahawaiolaa v. Norton, 222 F. Supp. 2d 1213, 1220 n.10 (D. Haw. 2002). Because the IRA ended allotments in 1934, see 25 U.S.C. § 461, they would not have affected later-recognized tribes, and hence there would have been no reason to include such tribes within the ambit of the statute.

The Secretary takes the view that the Act was intended not only to remedy past wrongs, but also to set a template for the future that would encourage the strength and stability of tribal communities. Based on this view, it would make no sense to distinguish among tribes based on the happenstance of their federal recognition status in 1934. The Secretary's view is buttressed by the fact that the Act contains a number of provisions that have nothing to do with land consolidation. See id. § 472 (Indian employment preference); id. § 476 (tribal organization).

The State reads United States v. John, 437 U.S. 634 (1978), to indicate that the Supreme Court had an initial interpretation of the Act that coincides with the State's interpretation. It is unclear if the Court had any such interpretation, and in any event, we find that John is not controlling here. In John, the Fifth Circuit had found that the Mississippi Choctaws were not eligible for benefits under the IRA because the tribe had not been recognized in 1934. United States

v. John, 560 F.2d 1202, 1212 (5th Cir. 1977); see also United States v. Miss. Tax Comm'n, 505 F.2d 633, 642 (5th Cir. 1974).  The Supreme Court reversed, relying on a different clause in the statute and finding the tribe eligible for benefits under the IRA, but on the basis that its members were "persons of one-half or more Indian blood."  437 U.S. at 650.

> Along the way, the Supreme Court stated:
>
> The 1934 Act defined "Indians" not only as "all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction," and their descendants who then were residing on any Indian reservation, but also as "all other persons of one-half or more Indian blood."

Id. (alteration in original) (quoting 25 U.S.C. § 479 (1976)).  The bracketed addition may be read to support the State's position, but the opinion contains no analysis on this point, and the Court rested its holding on an entirely separate provision of the Act, one not at issue here.  We are mindful that the Supreme Court's musings may warrant our attention.  See Rossiter v. Potter, 357 F.3d 26, 31 n.3 (1st Cir. 2004); but see P. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249 (2006).  In this case, however, given John's complete lack of analysis of the provision that concerns us, the relevant language seems to us to fall short even of being dicta.

Having found both text and context to be ambiguous, we turn to legislative history.  Despite the State's arguments to the

contrary, that history also does not clearly resolve the issue. Indeed, it suggests a reading of the phrase "now under federal jurisdiction" different from that offered by any of the parties, and is thus another source of ambiguity.

The congressional record establishes that the phrase "now under federal jurisdiction" was specifically added to the statutory definition of "Indian," a term defined separately from "tribe." See 25 U.S.C. § 479. The phrase was suggested by then-Commissioner of Indian Affairs John Collier in response to the concern that not all self-identified Indians deserved to benefit from the Act:

> The Chairman. But the thing about it is this, Senator; I think you have to sooner or later eliminate those Indians who are at the present time -- as I said the other day, you have a tribe of Indians here, for instance in northern California, several so-called "tribes" there. They are no more Indians than you or I, perhaps. I mean they are white people essentially. And yet they are under the supervision of the Government of the United States, and there is no reason for it at all, in my judgment. Their lands ought to be turned over to them in severalty and divided up and let them go ahead and operate their own property in their own way.
>
> Senator O'Mahoney. If I may suggest, that could be handled by some separate provision excluding from the benefits of the act certain types, but must have a general definition.
>
> Commissioner Collier. Would this not meet your thought, Senator: After the words "recognized Indian tribe" in line 1 insert "now under Federal jurisdiction"? That would limit the act to the Indians now under Federal jurisdiction, except that other Indians of

-23-

more than one-half Indian blood would get help.

To Grant to Indians Living Under Federal Tutelage the Freedom To Organize for Purposes of Local Self-Government and Economic Enterprise: Hearing on S.2755 and S.3645 Before the S. Comm. on Indian Affairs, 73d Cong. 266 (1934).

Commissioner Collier offered the phrase as a limitation, but it is not clear whether it was intended as a temporal limitation.  If the committee was concerned about the bona fides of an individual's status as an Indian and wanted to use the fact of federal jurisdiction to measure those bona fides, then there would have been no reason to distinguish between those under federal jurisdiction in 1934 and those who later came under federal jurisdiction.  In fact, the colloquy quoted above suggests that the committee sought to exclude some Indians already "under the supervision of the Government of the United States."  If the purpose was to exclude those who might later be dropped from federal jurisdiction, it would make more sense to measure status as of the date benefits were sought, not as of the date of enactment of the statute.

Indeed, the colloquy and the remainder of the hearing suggest that the committee was focused on the issue of individual Indians who received benefits from the federal government on the basis of a limited heritage and without acting as a part of a tribal community.  Earlier in the session, the chairman had raised

-24-

the case of a "former Vice President of the United States," who was apparently receiving Indian benefits, asking, "Why should the Government of the United States be managing the property of a lot of Indians who are practically white and hold office and do everything else, but in order to evade taxes or in order to do something else they come in under the Government supervision and control?" Id. at 264.

Thus, although none of the parties have raised this, it may well be that the phrase "now under federal jurisdiction" was intended to modify not "recognized Indian tribe," but rather "all persons of Indian descent." So interpreted, the purpose of the phrase might well have been to grandfather in those individuals already receiving federal benefits, but to otherwise insist that in the future, only individuals with at least one-half Indian blood would qualify. In that case, the limitation may well have been a temporal one, but the limitation, temporal or not, may have been intended to affect only the Secretary's authority to act for the benefit of an "individual Indian," not an "Indian tribe." See 25 U.S.C. § 465 ("Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired . . . ." (emphasis added)). After all, while Congress may have been concerned about misdirecting resources to individuals who were only Indians in name, the same concern would not apply to

federally recognized tribes, regardless of the date of federal recognition. In any event, this piece of legislative history amply supports the view that the statute is at least ambiguous and leaves room for administrative interpretation.

The other relevant piece of legislative history, heavily relied upon by the State, is the statement of Representative Edgar Howard, a cosponsor of the IRA:

> For purposes of this act, [the definitional section] defines the persons who shall be classed as Indian. In essence, it recognizes the status quo of the present reservation Indians and further includes all other persons of one-fourth Indian blood. The latter provision is intended to prevent persons of less than one-fourth Indian blood who are already enrolled members of a tribe or descendants of such members living on a reservation from claiming financial and other benefits of the act. Obviously the line must be drawn somewhere . . .

Kahawaiolaa, 222 F. Supp. 2d at 1220 n.10 (emphasis omitted) (quoting Congressional Debate on Wheeler-Howard Bill (1934) in III The American Indian and the United States (1973)) (internal quotation marks omitted).

The State interprets the reference to "status quo" as supporting its view that federal recognition of tribes was essentially frozen for purposes of the IRA in 1934. This seems to be a misinterpretation of the quote, however. Representative Howard did not say that the Act would "maintain" or "preserve" the status quo; rather he stated that the Act would "recognize" it.

Moreover, the quote refers not to Indian tribes, but to "reservation Indians." Thus, in context, this sentence is more likely a reference to that portion of the definition of an Indian, not at issue here, that covers "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." 25 U.S.C. § 479. This provision, with its explicit reference to 1934, covered those people of Indian descent then living on a reservation, without regard to whether they might independently qualify as Indians under the Act. In that sense, the definition accepted and "recognized" the status quo of the reservations.

Thus, we find from the text, context, and legislative history that section 479 is at least ambiguous as to whether the phrase "now under federal jurisdiction" disqualifies tribes that were federally recognized after 1934, such as the Narragansett Tribe, from the benefits of the IRA.[7]

---

[7]    We reject two additional arguments offered by the State. First, it is not significant that 25 U.S.C. § 478 required tribes to opt out of the IRA by a fixed date, rather than one that depended on the date of recognition. In general, it is difficult to see why any tribe would opt out of a statute designed to benefit it, and the legislative history suggests that the provision was a legacy from earlier drafts of the bill that imposed duties on tribes in return for the benefits. See Hearing on S.2755 and S.3645, supra, at 262. As eventually passed, the only potential purpose of the election was to protect the rights of those that preferred the allotment system, an issue not relevant to tribes recognized after 1934.

Second, we hesitate to attach much weight to the fact that later Congresses have explicitly provided for the IRA to apply to newly recognized tribes. As the Supreme Court has recently

-27-

(b)    Whether the Secretary's Interpretation Is Permissible

As we have found the meaning of section 479 to be ambiguous, we must consider whether the Secretary's interpretation is "permissible." Chevron, 467 U.S. at 843. An interpretation is permissible if it is "rational and consistent with the statute." NLRB v. United Food & Commercial Workers Union, Local 23, 484 U.S. 112, 123 (1987). The Secretary's construction meets this test. As discussed above, it is reasonable and is consistent with the language and legislative history of the IRA. It also is consistent with the policy of the IRA, which, as we have indicated, may permissibly be viewed not only as intending to reverse the government's allotment policy, but also as affirmatively conferring benefits on Indians, including Indian employment preferences and a statutory right to organize and adopt governing documents.

We therefore reject the State's argument that the text and purposes of the IRA prohibit the Secretary's interpretation of section 479. Rather, we find that the Secretary's construction of section 479 as allowing trust acquisitions for tribes that are

_____

cautioned again, the views of later Congresses carry little weight in determining the intent of the Congress that enacted the statute in question. See Massachusetts v. EPA, 127 S. Ct. 1438, 1460 & n.27 (2007). For the same reason, we do not take later enactments such as the 1994 amendments to section 476 to establish that Congress intended to make no distinctions among tribes in 1934. The parties have not pointed us to contemporaneous legislation that sheds further light on the issue.

recognized and under federal jurisdiction at the time of the trust application is entitled to deference.

### 2. Alleged Inconsistency of the Secretary's Interpretation

The State makes a separate argument on which it heavily relies. It argues that the Secretary's interpretation of section 479 to allow trust acquisitions for tribes not federally recognized in 1934 represents a change in position as to the eligibility of tribes for IRA benefits, and that this interpretation therefore is not entitled to deference. The State relies particularly on historical practice, and says that the Secretary has never, or at least has hardly ever, identified as IRA-eligible a tribal entity that was not federally recognized in 1934 and does not meet the half-blood test. The evidence is limited with respect to whether the Secretary's interpretation of section 479 of the IRA has been consistent over the past seventy-three years.[8]

The consistency of the Secretary's construction is supported, though not directly, by a regulation promulgated by the Secretary in 1980. The regulation, found at 25 C.F.R. § 151.2, sets forth definitions that pertain to the regulations governing trust acquisitions. 25 C.F.R. § 151.2(b) defines a tribe that may be eligible for a trust acquisition as "any Indian tribe, band,

---

[8] One difficulty arises from the fact that there seems to be no comprehensive list of tribes that were recognized and under federal jurisdiction as of June 18, 1934.

nation, pueblo, community, rancheria, colony, or other group of Indians . . . which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs."  The regulation does not distinguish between tribes recognized before June 18, 1934 and those recognized thereafter. Rather, it suggests that whether or not a group of Indians is considered a tribe, and therefore may be eligible to have land taken into trust, turns on a tribe's federal recognition status at the time a trust acquisition is requested.

Moreover, the Secretary's proffered interpretation of "now" as meaning "today" is consistent with regulations implementing other provisions of the IRA.[9]  For example, the regulation implementing 25 U.S.C. § 466, which directs the Secretary to regulate the operation and management of Indian forestry units, states that it applies to "any Indian tribe . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  25 C.F.R. § 163.1.  Similarly, the regulation

_____

[9]    The Secretary's interpretation also is consistent with regulations interpreting and implementing other federal statutes establishing Indian programs and services.  For example, the applicability of the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963, the applicability of minimum standards for basic education of Indian children in schools operated by the BIA, id. § 2001, and eligibility for Indian financial assistance and social services programs, id. § 13, all are defined in terms of current federal recognition.  See 25 C.F.R. § 23.2; id. § 36.3; id. § 20.100.

implementing 25 U.S.C. § 476, which allows eligible Indian tribes to organize and adopt constitutions and bylaws, defines eligibility in current terms: all Indian entities that have not voted to exclude themselves from the IRA and that are "included, or [are] eligible to be included, among those tribes . . . recognized and receiving services from the [BIA]" are eligible to organize under section 476. 25 C.F.R. § 81.1.

As to the Secretary's trust acquisition practice, it is not seriously disputed that the Secretary has never rejected an application to take land into trust for a federally recognized tribe on the ground that the tribe was not recognized and under federal jurisdiction in 1934. Responding to the State's allegations about whose trust acquisition applications have been granted, the Secretary and Indian amici have submitted to us lists of tribes that they assert were not federally recognized in 1934 for whom land has since been taken into trust. The State disputes this evidence, arguing that nearly all of the identified tribes either have no trust lands, are not "newly recognized" because they were under federal jurisdiction in 1934, or have obtained legislation from Congress specifically permitting trust acquisitions on their behalf.

The State's evidence of inconsistent practice is not persuasive. For example, although the State seems to concede that the Miccosukee Tribe was not recognized in 1934, it argues that the

later trust acquisition for that tribe identified by Indian amici was made pursuant to specific statutory authorization, not section 465. But the statute to which the State points us, 25 U.S.C. §§ 1741-1750e, does not itself authorize acquisition of the parcel identified by Indian amici. Rather, it authorizes acquisition of a different parcel. Indeed, in taking the parcel identified by Indian amici into trust, the Secretary explicitly relied on his authority under section 465.

Turning to a different distinction, the State argues that eight of the tribes identified by Indian amici were recognized and under federal jurisdiction in 1934 because they previously had signed treaties with the United States. It is not self-evident that simply because a tribe had signed a treaty with the U.S. government it necessarily was recognized and under federal jurisdiction in 1934; recognition as intended in section 479 requires an ongoing government-to-government relationship between a tribe and the United States. See Cohen's Handbook of Federal Indian Law § 3.02(3), at 138-40 (N.J. Newton et al., eds 2005).

Whether or not a treaty executed before 1934 has significance, however, the evidence is still that the Secretary has taken land into trust for tribes that did not appear to be federally recognized in 1934. We note two examples. The Secretary has taken land into trust for the Sault Ste. Marie Band of Chippewa Indians despite the Secretary's position that, regardless of prior

treaties, the Band was not federally recognized in 1934.  The Sault Ste. Marie Band is a successor to some of the Chippewa tribes that had signed treaties with the United States between 1785 and 1855. In addition, in 1855 the Band had signed two treaties with the United States.  Despite those treaties, however, by 1917 the Department of the Interior did not recognize the Band as an entity with which it had government-to-government relations.  Opinion of Nat'l Indian Gaming Comm'n, The St. Ignace Parcel at 7 (July 31, 2006); see also City of Sault Ste. Marie v. Andrus, 532 F. Supp. 157, 161 (D.D.C. 1980) (indicating that a period of non-recognition existed by stating that "although the question of whether some groups qualified as Indian tribes for purposes of IRA benefits might have been unclear in 1934, that fact does not preclude the Secretary from subsequently determining that a given tribe deserved recognition in 1934").  The State rejoins that the Department of the Interior cannot abrogate an Indian treaty.  But the validity of the Department's treatment of the Sault Ste. Marie Band's status under the treaties is not the issue before us.  What is important is the Department's position that the Band was not recognized and under federal jurisdiction in 1934.  Id. at 16.  Nevertheless, after 1934, the Secretary has invoked his section 465 authority to take land into trust for the Band.

The Grand Traverse Band of Ottawa and Chippewa Indians provides a similar example.  The Secretary has taken land into

-33-

trust for the Grand Traverse Band, which the Department of the Interior ceased to recognize in 1872. The Grand Traverse Band signed the 1855 Treaty of Detroit with the United States. In 1872, however, the then-Secretary of the Interior severed the United States' relationship with the Band and ceased to treat the Band as a federally recognized tribe. Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney for the W. Dist. of Mich., 369 F.3d 960, 961 (6th Cir. 2004); see also Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney for the W. Dist. of Mich., 198 F. Supp. 2d 920, 924 (W.D. Mich. 2002) ("Between 1872 and 1980, the Band continually sought to regain its status as a federally recognized tribe."). Yet, the Secretary has invoked his authority under section 465 to take twenty-one parcels of land into trust for the Band.[10]

---

[10] Indian amici also submitted opinions of the Solicitor of the Department of the Interior discussing various tribes' eligibility to organize under the IRA as evidence that the Secretary has consistently interpreted "now" in section 479 to mean "today." The State's attempt to distinguish these opinions is unsuccessful. For example, in discussing the IRA eligibility of the St. Croix Indians of Wisconsin, the Solicitor makes no mention whatsoever of the tribe's status as of 1934. Solicitor's Opinion, Jan. 29, 1941, 1 Op. Sol. on Indian Affairs 1026 (1979). The State argues that it is clear from context that the tribe was not recognized as of 1934. Yet, although this is true, the Solicitor discusses the fact that the tribe has never had a separate tribal status, and that until it does so, only those Indians who meet the half-blood test are eligible to organize under the IRA. Id. at 1027. Moreover, contrary to the State's position, the Solicitor's opinion indicates that if the tribe takes certain steps, it may later become eligible to organize under the IRA as a recognized band. Id.

Similarly, in discussing the Nahma and Beaver Island

The State also concedes that the Secretary appears to have taken land into trust for two tribes, the Tunica-Biloxi Indian Tribe and the Narragansetts themselves, that were not under federal jurisdiction in 1934 and for whom Congress has passed no specific act authorizing trust acquisitions. Even if we had no reason to doubt the State's argument that the Secretary has not historically taken land into trust for tribes not recognized in 1934, however, in at least some cases the Secretary has not looked to the status of the tribe in 1934 or to the specific statutory authority identified by the State in making the determination to take land into trust. In Baker v. Muskogee Area Dir., 19 I.B.I.A. 164 (1991), for example, the IBIA, in concluding that particular members of the Cherokee Nation of Oklahoma were eligible to have land taken into trust, did not rely on the 1936 Oklahoma Indian Welfare Act, 25 U.S.C. §§ 501-570, which authorized the Secretary to take land into trust for Indians in Oklahoma. Rather, the IBIA stated that the Indians "c[a]me within the IRA definition because they are members of a recognized Indian tribe under Federal

_____

Indians' eligibility to organize under the IRA, the Solicitor discusses the tribe's historical status, but then continues to discuss its then-current situation. Solicitor's Opinion, May 31, 1937, 1 Op. Sol. on Indian Affairs 747, 747-48 (1979). If the Solicitor had been concerned only with the tribe's status as of 1934, there would have been no reason for him to have considered the "recent . . . attitude of the Interior Department on the band status" of the Nahma and Beaver Indians, nor for him to state that it was "out of the question to establish any existing band status" before concluding that the Indians were eligible for organization only under the IRA's half-blood provision. Id. at 748.

-35-

jurisdiction." 19 I.B.I.A. at 179. The Secretary thus seems to have _intended_ to exercise his section 465 authority to take land into trust on the basis of current federal recognition.

The State has not met its burden of showing inconsistent interpretation by the Secretary. Moreover, even if the State had shown that the Secretary has changed his interpretation of section 479 over time, that would not necessarily resolve the matter in the State's favor. The _Chevron_ doctrine permits the Secretary some ability to alter his interpretation over time. See _Nat'l Cable & Telecomms. Ass'n_ v. _Brand X Internet Servs._, 545 U.S. 967, 981-82 (2005) (under _Chevron_, an agency should have flexibility to vary its interpretation of a statute over time). The Secretary has given a reasoned explanation for his interpretation.

We reject the State's argument that the Secretary has been inconsistent in his interpretation of section 479 and is therefore not entitled to deference.

C.        The Settlement Act

The State's next attack is to argue that the Settlement Act repealed the Secretary's trust authority as to all lands in Rhode Island. Alternatively, the State argues that the Settlement Act at least curtailed that authority so that any trust must preserve the State's civil and criminal jurisdiction over the Parcel.

There is simply nothing in the text of the Settlement Act, however, that accomplishes such a repeal or curtailment of the Secretary's trust authority. 25 U.S.C. § 1708(a) provides:

> Except as otherwise provided in this [Act], the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.

(emphasis added). The State would have us read the Act as if section 1708(a) applied to all lands the Tribe might ever acquire, either directly or as the beneficiary of a trust, but that is not what the section says. By its terms, section 1708(a) applies state law only to the 1800 acres of "settlement lands." The Parcel is not part of the settlement lands. No other provision of the Settlement Act directly provides for state jurisdiction outside of the settlement lands. No language in the Act applies state law to lands the Tribe might later acquire. More importantly, no language explicitly curtails, or even references, the Secretary's power under the IRA to take lands into trust and thereby to create Indian country.[11]

---

[11] Nor is this case controlled by our en banc decision in Narragansett III. That case concerned the State's jurisdiction over the settlement lands, see 449 F.3d at 20, and has no bearing on whether the Settlement Act abrogates the Secretary's trust authority outside of the settlement lands. Similarly, cases holding that section 1708(a) survived federal recognition and the conveyance of the settlement lands to federal trust are of no help to the State, since section 1708(a) refers only to the settlement lands. See Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n, 158 F.3d 1335, 1341-42 (D.C. Cir. 1998); Narragansett I, 19 F.3d at 694-95.

The State's argument thus depends on finding that the Settlement Act _implicitly_ repealed the IRA, at least in part.[12] The framework for evaluating such a claim of implicit repeal was set out by the Supreme Court in _Morton_ v. _Mancari_, 417 U.S. 535 (1974). First, we must look to affirmative manifestations of congressional intent to repeal the prior act, mindful of the "cardinal rule . . . that repeals by implication are not favored." _Id._ at 549 (omission in original) (quoting _Posadas_ v. _Nat'l City Bank of N.Y._, 296 U.S. 497, 503 (1936)) (internal quotation marks omitted). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for [finding] a repeal by implication is [that] the earlier and later statutes are irreconcilable." _Id._ at 550. Such a conflict is not lightly to be found. "[A]bsent a clearly expressed congressional intention to the contrary," we must "give effect to both [acts] if possible." _Id._ at 551 (quoting _United States_ v. _Borden Co._, 308 U.S. 188, 198 (1939)) (internal quotation marks omitted).

A determination of congressional intent must be rooted in the text of the Act. Nothing in the Act explicitly curtails the

---

[12]   The State adds nothing to its argument by also styling it as an issue of claim preclusion. Obviously, the earlier litigation that resulted in the Settlement Act could not have resolved the question raised in this case of whether the Settlement Act restricts the Secretary's trust authority under the IRA. By invoking "principles of res judicata," the State means nothing more than that the Tribe should be held to the settlement to which it previously agreed. What precisely the Tribe agreed to in the settlement is, of course, the question we are addressing.

Secretary's trust authority. The State offers two different lines of argument as to why provisions of the Act must be read to restrict that authority. One concerns how the Act affects the Tribe's rights; the other concerns how the Act affects the Secretary's authority. The provisions of the Settlement Act cited by the State, however, are most naturally read as merely resolving the claims that had clouded the titles of so much land in Rhode Island and that had led to the settlement embodied in the Act.

As to the provisions affecting the Tribe, the State relies independently on the extinguishment of aboriginal title in 25 U.S.C. §§ 1705(a)(2) and 1712(a)(2) and the further extinguishment in sections 1705(a)(3) and 1712(a)(3) of "all claims . . . based upon any interest in or right involving" certain land or natural resources. These provisions, however, follow sections 1705(a)(1) and 1712(a)(1), respectively, which validate "any transfer of land or natural resources" in the United States by the Narragansett Tribe or in Rhode Island by any Indian tribe "as of the date of said transfer."[13] The provisions then go on to state:

> (2) [T]o the extent that any transfer of land or natural resources described in subsection (a) of this section may involve land or

---

[13] Section 1705 applies to the Narragansett Tribe and any land in Charlestown, Rhode Island. Section 1712 applies to land elsewhere in Rhode Island transferred by other Indian tribes. The relevant provisions in each are materially the same for our purposes here.

natural resources to which [an Indian tribe] had aboriginal title, subsection (a) of this section shall be regarded as an extinguishment of such aboriginal title as of the date of said transfer; and

(3) by virtue of the approval of a transfer of land or natural resources effected by this section, or an extinguishment of aboriginal title effected thereby, all claims . . . by the [Narragansett Tribe], or any predecessor or successor in interest, member or stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished as of the date of the transfer.

25 U.S.C. § 1705(a). Given the references back to the transfers validated in paragraph (1), the evident purpose of these provisions is to extinguish claims based on the purported invalidity of those transfers.

The State's arguments that the provisions should be read more broadly are unavailing. First, the State argues that the extinguishment of aboriginal title over land in Rhode Island precludes the later exercise of tribal sovereignty over Rhode Island land acquired by the Secretary in unrestricted trust. The Secretary disputes whether aboriginal title is ever the basis for tribal sovereignty, but in any event, it is clear that such title is not the only basis for tribal sovereignty. This is evident from the Supreme Court's decision in City of Sherrill v. Oneida Indian Nation, 544 U.S. 197 (2005). In Sherrill, the Supreme Court both

-40-

held that "the Tribe [could not] unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue," id. at 202-03, and directed the Oneidas to 25 U.S.C. § 465 as "the proper avenue for [the tribe] to reestablish sovereign authority over [the relevant] territory," id. at 221.  The State's protestation that Sherrill did not involve a statutory extinguishment of aboriginal title is beside the point.  However aboriginal title or ancient sovereignty was lost, the IRA provides an alternative means of establishing tribal sovereignty over land.

Trust acquisition is not incompatible with the extinguishment of aboriginal title.  The Mashantucket Pequot Indian Claims Settlement Act, for example, contains virtually identical language extinguishing aboriginal title "to any land or natural resources the transfer of which was approved and ratified" by the Act.  25 U.S.C. § 1753(b).  At the same time, the Act provides that certain land and natural resources "located within the settlement lands shall be held in trust by the United States for the benefit of the Tribe," id. § 1754(b)(7), and that such lands are "declared to be Indian country," id. §§ 1752(7), 1755.  It is implausible to think that Congress intended the extinguishment of aboriginal title in the Rhode Island Settlement Act to preclude the taking of land

-41-

into unrestricted trust, but did not intend for identical language in the Mashantucket Settlement Act to do so.[14]

Alternatively, the State argues that the "all claims" language in paragraph (3) even more broadly forecloses the assertion of tribal sovereignty over non-settlement lands. To hold otherwise, says the State, would render that language surplusage. Paragraphs (2) and (3) are complementary, however, not duplicative. While paragraph (2) extinguishes a form of title, paragraph (3) extinguishes claims. Moreover, paragraph (3) covers claims based on other forms of title, besides aboriginal title, that the Tribe might have held to land in Rhode Island prior to the Settlement Act.

The State's broad interpretation of paragraph (3) proves too much. The State argues that the paragraph precludes an assertion of tribal sovereignty over any land in Rhode Island. Nothing in the language of the provision, which refers to "any interest in or right involving" such land, distinguishes between claims of sovereignty and traditional property claims. Indeed, the latter are explicitly included. See id. § 1705(a)(3) ("including but not limited to claims for trespass damages or claims for use and occupancy"). It would be highly improbable that Congress

_____

[14] We attach little significance to the fact that the Mashantucket Settlement Act explicitly authorizes trust acquisition, while the Rhode Island Settlement Act does not. The former, unlike the latter, granted federal recognition to the tribe. See 25 U.S.C. § 1758(a).

intended to prevent the Tribe from asserting any ownership interest over land it purchased outside the settlement lands, and it would be contradictory as to the settlement lands themselves. Thus, there is no support for reading this provision as precluding all future assertions of tribal sovereignty over land in Rhode Island.

Ultimately, this entire line of argument by the State misses the point that what is at issue is not what the Tribe may do in the exercise of its rights, but what the Secretary may do. The displacement of state law arises from the Secretary's authority and not from the Tribe's mere purchase of the land. See Cass County, Minn. v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 113-15 (1998). In order to prevail on its claim of implied repeal, the State must show that the Settlement Act repeals the Secretary's authority under the IRA.

As to the implied repeal of the Secretary's power, the State first argues that the Secretary is bound by the extinguishment of the Tribe's claims because that extinguishment binds the Tribe's "successor in interest." 25 U.S.C. § 1705(a)(2), (3). Even if the Secretary is such a "successor in interest," however, those provisions cannot plausibly be read to repeal the Secretary's power under the IRA to take land into trust. The Secretary's power does not turn on the Tribe's original aboriginal interest in the Parcel, before it purchased the land, nor does it

-43-

turn on whether the Secretary is a successor in interest to the Tribe.[15]

The State also relies on 25 U.S.C. § 1707(c), which provides:

> Upon the discharge of the Secretary's duties under sections 1704, 1705, 1706, and 1707 of this title, the United States shall have no further duties or liabilities under this subchapter with respect to the Indian Corporation or its successor, the State Corporation, or the settlement lands. . . .

The language of this provision, however, cannot be read to have a preclusive effect or to limit the Secretary's powers in any way. The statement that the United States has "no further duties or liabilities under this subchapter" merely delimits the federal government's obligations in implementing the Settlement Act.

We reject the State's suggestion that this language parallels the language in the Mashantucket Settlement Act that the Second Circuit found to prohibit certain trust acquisitions. See Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior, 228 F.3d 82, 88 (2d Cir. 2000). The Mashantucket Settlement Act uses very

_____

[15]    We do not accept the State's comparison of the Rhode Island Settlement Act to the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601-1629h, and the resulting suggestion that trust acquisition would be as inappropriate in Rhode Island as it purportedly would be in Alaska. ANCSA eliminated previously existing Indian country in Alaska. See Native Vill. of Venetie, 522 U.S. at 532-34. Even if one might infer from that elimination an intent to preclude later trust acquisitions, no such intent can be inferred from the Rhode Island Settlement Act's failure to affirmatively establish Indian country for an as-yet unrecognized tribe.

different language that provides that "the United States shall have no further trust responsibility with respect to [certain] land and natural resources" outside of the settlement lands.  25 U.S.C. § 1754(b)(8).  Disclaiming "trust responsibility" over land is nothing like disclaiming "duties or liabilities under this subchapter."

There is nothing in the text of the Settlement Act that clearly indicates an intent to repeal the Secretary's trust acquisition powers under the IRA, or that is fundamentally inconsistent with those powers.[16]  This lack of language is not because either Congress or the parties failed to anticipate that the Tribe might later become federally recognized and eligible for the benefits of the IRA.  The Settlement Act specifically provides for a restraint on alienation of the settlement lands "if the Secretary subsequently acknowledges the existence of the Narragansett Tribe of Indians."  Id. § 1707(c).  The underlying JMOU also explicitly recognized that the Tribe would "not receive Federal recognition" in the implementation of the settlement, but would "have the same right to petition for such recognition . . . as other groups."  JMOU para. 15.

Had the Act intended to limit the Secretary's trust authority in case of federal recognition, it could have done so

---

[16] The State has not cited any legislative history that might lead us to interpret the text differently.

explicitly. It would have been easy to extend the provisions of section 1708(a) preserving state sovereignty to cover all lands in Rhode Island owned by or held in trust for the Tribe. No such language appears in the Act. Similarly, as the IBIA also noted, paragraph 15 of the JMOU would have been "a logical place for the parties to set out any restrictions" on the Secretary's trust authority following federal recognition of the Tribe. Town of Charlestown, 35 I.B.I.A. at 101. No such restrictions appear. Nor does the Settlement Act contemplate any role for the State to play in the Secretary's decision whether to take the land into trust. This is in contrast to the Indian Gaming Regulatory Act.

In other settlement acts, Congress has specifically described limits on the Secretary's trust authority. In the Maine Indian Claims Settlement Act, Congress expressly precluded application of section 465. 25 U.S.C. § 1724(e) ("Except for the provisions of this [Act], the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians or Indian nations, or tribes, or bands of Indians in the State of Maine."). In the Mashantucket Settlement Act, Congress precluded the trust acquisition of non-settlement lands purchased with settlement funds. See Blumenthal, 228 F.3d at

88. The absence of any restrictions in the Settlement Act supports our finding that no restrictions were intended.[17]  See id. at 90.

The State's fallback position is that the Settlement Act requires that this court order the Secretary to honor the intent of the bargain it believes is embodied in the Act by putting the Parcel into a restricted trust, subject to state laws and jurisdiction.[18]  Acknowledging the genuineness of the State's sense that its bargain has been upset, we find that the relief it seeks is not an appropriate exercise of judicial power.

In the Settlement Act, the State procured at least two clear benefits: (1) the settling of disputed land claims and (2) the application of its civil and criminal laws and jurisdiction to the settlement lands.  Beyond that, the State argues that it would never have agreed to displacement of state law as to later acquired parcels if the issue had surfaced during the negotiations.  The

---

[17]    There are also other examples of Congress's imposing explicit conditions on the taking of land into trust, for example, by limiting the number of acres of land and the number of acre feet of water rights.  See Nevada v. United States, 221 F. Supp. 2d 1241, 1244 (D. Nev. 2002) (discussing section 103(A) of the Fallon Paiute Shoshone Indian Tribe Water Rights Settlement Act of 1990, Pub. L. No. 101-618, 104 Stat. 3289, 3291).

[18]    The Secretary takes the position that he has no authority to impose restrictions on land taken into trust under the IRA, absent a statutory directive imposing such restrictions.  We do not reach this issue.  To the extent that the State argues that the Settlement Act itself is such a statutory directive requiring a restricted trust, we reject that argument for the same reasons that we found that the Settlement Act does not eliminate trust authority altogether.

State argues that the practical consequences of the unrestricted trust leave it in an entirely unsatisfactory position and undermine the central bargain. Rhode Island points out that it is a small, very populous state and that the practical consequences of establishing Indian country for its nearby towns may be far greater than they would be in less densely populated areas.

Even so, we are still bound by the language of the Settlement Act. Even viewing the State's argument in contract terms, it is rare that a court will step in and reform a contract. See Broadley v. Mashpee Neck Marina, Inc., 471 F.3d 272, 275 (1st Cir. 2006) (reversing the district court's reformation of a contract). Our ability to edit, as opposed to interpret, an act of Congress is no less constrained: only a finding of absurdity, not present here, provides the necessary precondition. Compare Green v. Bock Laundry Mach. Co., 490 U.S. 504, 510-11 (1989) (editing a federal rule of evidence where the apparent distinction between civil plaintiffs and civil defendants would be "unfathomable"), with W. Va. Univ. Hosps. v. Casey, 499 U.S. 83, 100-01 (1991) (refusing to read in an additional component to a fee-shifting provision on the basis that Congress "simply forgot" to include it). See also Blumenthal, 228 F.3d at 91 ("While we might question the wisdom of different jurisdictional provisions governing different trust lands, we will not provide a strained

interpretation of the Settlement Act simply to avoid such a result."). The judiciary may not usurp the role of Congress.

D.          Constitutional Claims

In support of recognition of its state sovereignty interests under the Constitution, the State presents four arguments. It argues first that the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, does not provide the Secretary the authority to displace state law within a state's boundaries, and that section 465 of the IRA therefore violates the Tenth Amendment. Next, it argues that the Secretary may not, in any event, displace state law without the State's consent, by operation of the Enclave Clause of the Constitution. Id. art. I, § 8, cl. 17. The State further argues that the Secretary's action is barred by the Admissions Clause, id. art. IV, § 3, cl. 1, which prohibits formation of new states within the jurisdiction of any other state. Finally, the State argues that section 465 is an unconstitutional delegation of legislative authority. We reject all of these arguments.

1.          The Indian Commerce Clause and the Tenth Amendment

The authority to regulate Indian affairs is within the enumerated powers of the federal government. Id. art. I, § 8, cl. 3; Cotton Petroleum Corp., 490 U.S. at 192 ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs."); Morton, 417

-49-

U.S. at 551 (noting that Congress has plenary power "to deal with the special problems of Indians," including the power to legislate on their behalf). "With the adoption of the Constitution, Indian relations became the exclusive province of federal law." County of Oneida v. Oneida Indian Nation of N.Y., 470 U.S. 226, 234 (1985); see also United States v. Forty-Three Gallons of Whiskey, 93 U.S. 188, 194 (1876) ("Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes . . . .").

The Tenth Amendment to the U.S. Constitution reserves to the states those powers not expressly delegated to the federal government. The powers delegated to the federal government and those reserved to the states by the Tenth Amendment are mutually exclusive. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." New York v. United States, 505 U.S. 144, 156 (1992). Because Congress has plenary authority to regulate Indian affairs, section 465 of the IRA does not offend the Tenth Amendment. Cf. Herrera-Inirio v. INS, 208 F.3d 299, 307 (1st Cir. 2000) ("Because Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters.").

2.    The Enclave Clause

The Enclave Clause of the Constitution provides that Congress may "exercise exclusive legislation . . . over all places

purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17. The Enclave Clause's provision for exclusive federal jurisdiction was intended to ensure that "places on which the security of the entire Union may depend" are not "in any degree dependent on a particular member of it." Fort Leavenworth R.R. Co. v. Lowe, 114 U.S. 525, 530 (1885) (quoting The Federalist No. 43 (James Madison)) (internal quotation marks omitted). The State argues that "[p]rimary federal jurisdiction through federal superintendence over the land . . . coupled with Congress's exclusive legislative authority over Indian matters . . . collectively operate to exclude state law [on trust lands]." As a result, it argues, trust acquisitions create federal enclaves and therefore require state consent.

We disagree. First, trust land does not fall within the plain language of the Enclave Clause. It is not purchased "for the erection of forts, magazines, arsenals, dockyards, [or] other needful buildings." Rather, it is held in trust for the benefit of Indians.

Second, in Surplus Trading Co. v. Cook, 281 U.S. 647 (1930), the Supreme Court offered an Indian reservation as a "typical illustration" of federally owned land that is not a federal enclave because state civil and criminal laws may still

have partial application therein.  Id. at 651.  The Supreme Court recently confirmed the reasoning underlying the observation that Indian lands are not federal enclaves:

> Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border.  Though tribes are often referred to as "sovereign" entities, it was "long ago" that "the Court departed from Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries."

Hicks, 533 U.S. at 361 (alteration in original) (quoting White Mountain Apache Tribe, 448 U.S. at 141 (quoting Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 561 (1832))).  As a result, the Secretary's trust acquisition of lands for the Narragansetts does not even implicate the Enclave Clause.

### 3.    The Admissions Clause

The Admissions Clause of the Constitution provides that "no new state shall be formed or erected within the jurisdiction of any other state; nor any state be formed by the junction of two or more states, or parts of states, without the consent of the legislatures of the states concerned as well as of the Congress." U.S. Const. art. IV, § 3, cl. 1.  The State argues that the creation of Indian country within Rhode Island amounts to the formation of a new state within Rhode Island's jurisdiction.

This argument is without merit.  The Admissions Clause prohibits Congress only from unilaterally establishing within an

existing state a body "on an equal footing with the original states in all respects whatsoever." Coyle v. Smith, 221 U.S. 559, 567 (1911) (internal quotation marks omitted). For purposes of the Admissions Clause, a state is a body "equal in power, dignity and authority" to existing states. Id. The Secretary's trust acquisition for the Narragansetts does not establish such a body. As a result, the acquisition does not violate the Admissions Clause.

4.    The Nondelegation Doctrine

The Constitution vests "[a]ll legislative Powers [t]herein granted . . . in a Congress of the United States." U.S. Const. art. I, § 1. Congress "is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is . . . vested." Panama Refining Co. v. Ryan, 293 U.S. 388, 421 (1935). Yet, the Supreme Court has recognized that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." Mistretta v. United States, 488 U.S. 361, 372 (1989). As a result, the Supreme Court has repeatedly held that Congress may confer decisionmaking authority on agencies as long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001) (second alteration in

original) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)) (internal quotation marks omitted). The Court "has deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" Mistretta, 488 U.S. at 372-73 (quoting Am. Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946)).

The State and its amici argue that section 465 lacks the requisite "intelligible principle" and therefore is an unconstitutional delegation of legislative authority.

25 U.S.C. § 465 provides:

The Secretary of the Interior is authorized, in his discretion, to acquire . . . any interest in lands, . . . for the purpose of providing land for Indians.

For the acquisition of such lands, . . . and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: Provided, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico . . . becomes law.

. . . .

Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land

-54-

is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465.

In support of its argument, the State relies primarily on an Eighth Circuit decision, South Dakota v. U.S. Dep't of the Interior, 69 F.3d 878 (8th Cir. 1995), vacated, 519 U.S. 919 (1996), that held that section 465 was an impermissible delegation that was completely lacking in "boundaries" and "intelligible principles" and that "would permit the Secretary to purchase the Empire State Building in trust for a tribal chieftain as a wedding present." Id. at 882. The circuit opinion in South Dakota was vacated by the Supreme Court, which did not publish an opinion explaining its decision, 519 U.S. at 919-20, and as a result has not set any precedent. Lovelace v. Se. Mass. Univ., 793 F.2d 419, 422 (1st Cir. 1986) (per curiam).

On remand, the Eighth Circuit held that "the purposes evidence in the whole of the IRA and its legislative history sufficiently narrow the delegation and guide the Secretary's discretion in deciding when to take land into trust."[19] South Dakota v. U.S. Dep't of Interior, 423 F.3d 790, 797 (8th Cir. 2005). The court noted that the statute allows the Secretary to

---

[19] In so holding, the Eighth Circuit agreed with the Tenth Circuit's decision in United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999), which held that section 465 contains standards sufficient to guide the Secretary's exercise of discretion. Id. at 1137.

acquire trust lands only for Indians as defined in 25 U.S.C. § 479, and that the statute prohibits the Secretary from taking extra-reservation lands into trust for Navajo Indians. See 423 F.3d at 797. The South Dakota court also referred to the legislative history of the IRA,[20] which explains that the goals motivating trust acquisitions are "rehabilitati[on] [of] the Indian's economic life" and "develop[ment] [of] the initiative destroyed by . . . oppression and paternalism." Id. at 798 (quoting Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152 (1973) (quoting H.R. Rep. No. 73-1804, at 6-7 (1934))) (internal quotation marks omitted). As the dissent from the original South Dakota decision had noted, the historical context of the IRA is important; section 465's "direction that land be acquired 'for the purpose of providing land for Indians[]' has specific meaning in light of the failure of the allotment policy and [c]ongressional rejection of assimilation as a goal." 69 F.3d at 887 (Murphy, J., dissenting).

Other provisions of the IRA reinforce such an interpretation. See 25 U.S.C. § 461 (prohibiting allotment of reservation lands to individual Indians); id. § 462 (extending indefinitely existing trust periods and restrictions on alienation

---

[20] Amici states argue that legislative history should not factor into the intelligible principle analysis. We note simply that the Supreme Court in Mistretta referred to legislative history in explaining that the Sentencing Reform Act of 1984 was not an unconstitutional delegation of legislative authority. See 488 U.S. at 375 n.9, 376 n.10.

of Indian lands); id. § 463(a) (authorizing restoration of surplus lands to tribal ownership); id. § 464 (prohibiting the transfer of restricted Indian lands except to Indian tribes). We find the reasoning of the Eighth Circuit's second South Dakota opinion persuasive.

The Ninth Circuit's decision in Confederated Tribes of Siletz Indians of Oregon v. United States, 110 F.3d 688 (9th Cir. 1997), also supports the Secretary's position that section 465 is not an unconstitutional delegation of legislative authority. Although not addressing a nondelegation challenge to section 465, the Confederated Tribes court stated that "[t]he general delegation of power to the Executive to take land into trust for the Indians is a valid delegation because Congress has decided under what circumstances land should be taken into trust and has delegated to the Secretary of the Interior the task of deciding when this power should be used." Id. at 698.

The Supreme Court has upheld the constitutionality of statutes authorizing regulation in the "public interest," see, e.g., Nat'l Broad. Co. v. United States, 319 U.S. 190, 225-26 (1943); N.Y. Cent. Sec. Corp. v. United States, 287 U.S. 12, 24-25 (1932), as well as statutes authorizing regulation to ensure fairness and equity, see Am. Power & Light Co., 329 U.S. at 104-05; Yakus v. United States, 321 U.S. 414, 420, 426-27 (1944). As the Court stated in its most recent nondelegation decision, it has

"almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." Am. Trucking Ass'ns, 531 U.S. at 474-75 (quoting Mistretta, 488 U.S. at 416 (Scalia, J., dissenting)) (internal quotation marks omitted). We similarly decline to do so here. We hold that section 465 is not an unconstitutional delegation of legislative authority.

E.          APA-Related Claims

The focus of the en banc proceedings was on the three sets of arguments discussed above. The State presented another set of claims, rejected by the panel, that the Secretary's decision to take the Parcel into trust for the Tribe violates the APA. The State did not seek en banc review of this issue. In granting en banc review, we withdrew our panel opinion, which had been reported at 423 F.3d 45. In the interests of completeness, we now also reject the State's APA claims.

We set forth here a shortened and slightly modified version of the panel's opinion as to this issue.

The State claims that the Secretary's action was an abuse of discretion under the APA. Our review of the Secretary's decision is governed by section 706(2)(A) of the APA, which provides that a court may set aside agency action only where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An

agency's determination is arbitrary and capricious if the agency lacks a rational basis for making the determination or if the decision was not based on consideration of the relevant factors. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). The Court's review under section 706(2)(A) is highly deferential, and the Secretary's action is presumed to be valid. See Conservation Law Found. of New Eng., Inc. v. Sec'y of Interior, 864 F.2d 954, 957-58 (1st Cir. 1989). A reviewing court cannot substitute its own judgment for that of the agency. Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Associated Fisheries, 127 F.3d at 109. No deference is given to the district court's decision. Associate Fisheries, 127 F.3d at 109.

The State makes five arguments as to why the Secretary's decision was unlawful under section 706(2)(A): (1) the BIA relied on the Tribe's findings, rather than conducting an independent evaluation of the Tribe's application; (2) the BIA misapplied the factors enumerated in 25 C.F.R. § 151.10 for evaluating a fee-to-trust transfer; (3) the Native American Housing Assistance and Self-Determination Act cooperation agreement waiver violated due process; (4) the BIA failed to consider the environmental impact of the housing project planned for the Parcel and the project's compliance with the Coastal Zone Management Act; and (5) the BIA

-59-

failed to consider noncompliance with the Indian Gaming Regulatory Act. We disagree, and we find that the Secretary's decision to accept the Parcel into trust did not violate the APA.

1. <u>Independent Evaluation of the Tribe's Trust Application</u>

The State claims that the BIA's decision to take the Parcel into trust was arbitrary and capricious because it relied exclusively on the Tribe's assertions and failed to consider other important facts that occurred between 1993 and 1997. The State points to substantial passages in the Secretary's decision that contain verbatim restatements of information provided by the Narragansett Tribe in support of their 1993 trust application as evidence that the BIA failed to conduct an independent evaluation of the Tribe's 1997 application.

There is ample evidence in the administrative record that the BIA conducted its own, independent evaluation of the Tribe's application and that it considered the events following the Tribe's 1993 application. For example, between 1993 and 1997, the BIA required the Tribe to supplement its initial Environmental Assessment; conducted an environmental hazard survey of the Parcel; required confirmation of consistency with the State's Coastal Resources Management Plan; was apprised of, and offered to facilitate, negotiations between the Tribe, the Town, and the State concerning both environmental and jurisdictional issues attendant to the Tribe's development of the Parcel; and specifically

-60-

requested that the Regional Solicitor address several legal and jurisdictional issues raised by the State in its comments to the BIA on the Tribe's trust application. This demonstrates that the BIA's determination was the result of its own, independent evaluation of the 1997 application.

2. Application of the 25 C.F.R. § 151.10 Factors

The State claims that the BIA failed to apply the proper criteria when it evaluated the Tribe's application for trust acquisition. The regulations governing the BIA's evaluation of applications to have land taken in trust are laid out at 25 C.F.R. part 151. The factors to be considered for an on-reservation acquisition are found in section 151.10, and the factors for an off-reservation acquisition are found in section 151.11.[21] In making the decision to accept the Parcel into trust, the BIA considered the on-reservation factors in section 151.10.[22] The

---

[21] For the purpose of 25 C.F.R. part 151, land is considered to be on-reservation if it is "located within or contiguous to an Indian reservation," 25 C.F.R. § 151.10, and off-reservation where "the land is located outside of and noncontiguous to the tribe's reservation," id. § 151.11. The State challenges the finding by the BIA and the district court that the Parcel is adjacent to the settlement lands, yet recognizes that this determination is insignificant to the application of either section in this case, as the sections differ only slightly. Compare id. § 151.10, with id. § 151.11. The Parcel is adjacent to the Settlement Lands, but separated from them by a town road. Narragansett II, 89 F.3d at 911.

[22] Those factors include:

> (a) The existence of statutory authority
> for the acquisition and any limitations

State claims that the BIA failed to consider "the need of . . . the tribe for additional land," 25 C.F.R. § 151.10(b).  The State also questions whether the BIA sufficiently scrutinized "the tribe's justification of anticipated benefits from the acquisition" as required by section 151.11(b).[23]

_____

> contained in such authority;
>
> (b) The need of the individual Indian or the tribe for additional land;
>
> (c) The purposes for which the land will be used;
>
> . . .
>
> (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
>
> (f) Jurisdictional problems and potential conflicts of land use which may arise; and
>
> (g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.
>
> . . . .

25 C.F.R. § 151.10.

[23] The criteria to be considered pursuant to section 151.11(b) are as follows:

> The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's

A reviewing court will determine only "whether the [BIA's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens To Preserve Overton Park, 401 U.S. at 416. The fact that the BIA found the Parcel, which is across a town road from the settlement lands, to be "contiguous" to the settlement lands that are currently in trust, and thus determined that it should consider the "on-reservation" factors enumerated in 25 C.F.R. § 151.10, is certainly not clear error and is within the Secretary's discretion. The record shows that the BIA complied with section 151.10, including evaluating the Tribe's need for the additional land, and the State has not shown that the Secretary made a clear error of judgment.

It was not necessary for the BIA to consider the factors under section 151.11, since it found section 151.10 to be applicable to this trust determination. While the Secretary need not have considered section 151.11(b), the close proximity between the Tribe's settlement lands and the Parcel would not have required the Secretary to give the greatest scrutiny to the "tribe's

reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. . . .

25 C.F.R. § 151.11(b).

justification of anticipated benefits from the acquisition." 25 C.F.R. § 151.11(b).

      3.     <u>The Native American Housing Assistance and Self-Determination Act Cooperation Agreement Requirement</u>

At the time of the BIA's decision to acquire the Parcel into trust, HUD was precluded from releasing funds pursuant to the Native American Housing Assistance and Self-Determination Act for any tribe's housing development unless an agreement for local cooperation on issues such as taxes and jurisdiction had been entered into by the tribe and the local government where the housing was located. 25 U.S.C. § 4111(c). In the instant case, the Narragansett Tribe did not obtain such an agreement with the Town. However, section 4111(c) has since been amended to permit HUD to waive the cooperation agreement requirement, 25 U.S.C. § 4111(c), <u>as amended by</u> Pub. L. No. 106-569, § 503(a)(2), 114 Stat. 2944, 2962 (2000), and the Tribe claims to have obtained such a waiver.

The State argues that this waiver was invalid because the State apparently did not receive notice of the Tribe's application for a waiver until after the waiver had been granted. On appeal, the State contends that if the BIA accepted the waiver, the BIA has inherited the legal error and acted in an arbitrary and capricious manner. As the district court noted, "25 U.S.C. § 4111(c) establishes a prerequisite to HUD's award of housing grants. It

does not pertain to the BIA's trust acquisition authority." Carcieri, 290 F. Supp. 2d at 178. Nothing in the § 151.10 factors requires the BIA to ensure that a local cooperation agreement is in place for an Indian Housing project.

    4.      <u>Environmental Considerations</u>

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370(f), and its supporting regulations promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. parts 1500-1518, direct federal agencies to consider the environmental impact of agency decisions. The State argues that the Secretary and the BIA (1) failed to consider the environmental impact in reaching the decision to accept the Parcel into trust because no Environmental Impact Statement (EIS) was prepared, and (2) failed to conduct their own evaluation of the environmental impact and instead improperly relied on an Environmental Assessment (EA) submitted by the Narragansett Tribe. We disagree.

Federal agencies are required to prepare an EIS for any action that could significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. NEPA provides that "to the fullest extent possible . . . all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the

environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). However, in the absence of a finding that the proposed action would significantly affect the quality of the human environment, the BIA was not required to prepare an EIS. See, e.g., Londonderry Neighborhood Coal. v. Fed. Energy Regulatory Comm'n, 273 F.3d 416, 419 (1st Cir. 2001) (quoting Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 49 (D.C. Cir. 1999)).

The CEQ has issued guidance on whether to prepare an EIS. This guidance provides that "if the agency determines on the basis of the environmental assessment not to prepare a statement," then the agency should "[p]repare a finding of no significant impact" pursuant to section 1508.13. 40 C.F.R. § 1501.4(e). The applicant may prepare the EA provided that the agency "make[s] its own evaluation of the environmental issues and take[s] responsibility for the scope and content of the environmental assessment." Id. § 1506.5(b). In this case, the BIA followed its standard operating procedure for externally initiated proposals by obtaining an EA from the Tribe and considering it along with supplemental information the BIA requested from the Tribe and information gathered independently by the BIA. See NEPA Handbook para. 4.2.B. After reviewing the EA and the requisite supplemental information, the BIA completed its environmental analysis and issued a finding of no significant impact. The BIA's issuance of a finding of no

significant impact satisfied its responsibilities under NEPA. <u>See</u> 40 C.F.R. § 1501.4(e).

Separately, the State contends that the BIA should have obtained a federal consistency review in accordance with the Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451-1466, before making its trust determination. The CZMA requires state consultation on federally permitted coastal development activities.[24] The State asserts that the BIA's failure to take

_____

[24] Specifically, 16 U.S.C. § 1456(c) provides, in relevant part:

> (1)(A) Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs. A Federal agency activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3).
>
> . . . .
>
> (C) Each Federal agency carrying out an activity subject to paragraph (1) shall provide a consistency determination to the relevant State agency . . . .
>
> (2) Any Federal agency which shall undertake any development project in the coastal zone of a state shall insure that the project is, to the maximum extent practicable, consistent with the enforceable policies of approved State management programs.

direct action to ensure that the housing project was consistent with the Rhode Island Coastal Zone Management Program (RICZMP) before making its trust determination was a violation of the CZMA. We disagree.

The State has failed to demonstrate that a consistency review of the Tribe's housing development was necessary at the trust acquisition stage. The development of the Parcel is a project that was commenced by the Tribe, in conjunction with HUD, prior to the Tribe's application for trust acquisition. The Rhode Island Coastal Resources Management Council correctly recognized that the development of the Parcel, which required its own federal consistency determination, was a separate matter from the trust acquisition, and properly found that the Tribe's application for trust status was consistent with the RICZMP.

5.    The Indian Gaming Regulatory Act

Finally, the State contends that the true purpose of the Tribe's application for trust acquisition is the development of gambling facilities on the Parcel -- rather than development of tribal housing as the BIA found in its evaluation pursuant to 25 C.F.R. § 151.10(c) -- and that the BIA's failure to consider the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, in its decision was an abuse of discretion. We reject the State's argument that the Secretary's decision to acquire the Parcel in

trust should be reversed and that further inquiry into whether the Parcel would be used for gaming purposes is now required.

No evidence that the Tribe intends to use the Parcel for anything other than tribal housing, as determined by the BIA, was presented. "In fact, after the plaintiffs expressed concern over the potential for development of a gaming facility on the parcel, the tribe reaffirmed that it intended to use the parcel for a housing development and stated that it had 'no immediate plans for any further future development.'" Carcieri, 290 F. Supp. 2d at 178 (quoting II Admin. Rec., tab N).

As support for its position, the State points to an IBIA decision that reversed a trust acquisition decision due to the BIA's failure to consider the impact of a potential casino, even though the applicants denied any intention of using the property for a casino. See Vill. of Ruidoso, N.M. v. Albuquerque Area Dir., Bureau of Indian Affairs, 32 I.B.I.A. 130 (1998). However, in Village of Ruidoso, the IBIA determined that, despite the tribe's denial that the application for trust acquisition was for gaming purposes, it was clear from the planned gaming-related uses of the property and the fact that the property had been given to the tribe by a company that the BIA "apparently understood to have some gaming connection with the Tribe" that the application might well have been for gaming purposes. Id. at 136. In that situation, the

BIA should have further analyzed the possibility of gaming.  Id. at 140.

> We agree with the district court that
>
> although the possibility that the parcel might be used for gaming activities was raised before the BIA, the bureau's determination that the parcel would be used to provide housing was amply supported by the record.  In view of the deferential standard of review afforded to agency decisions under the APA, the bureau's determination in this regard must be sustained.

Carcieri, 290 F. Supp. 2d at 178.

### III.

The decision of the district court is affirmed.  Costs are awarded to the Secretary.

**-Dissenting opinion follows-**

**HOWARD**, **Circuit Judge**, **dissenting**. Respectfully, I disagree with the majority's analysis of the Settlement Act. In my view, the majority opinion disregards Congress's (and the parties') purpose in passing the Settlement Act and is inconsistent with our own recent interpretation of the Settlement Act. See Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16 (1st Cir. 2006) (en banc). At bottom, under the Settlement Act, the Secretary may only take the Parcel into a restricted trust[25] that provides for Rhode Island's continued criminal and civil jurisdiction over the Parcel. The State makes this argument in two forms. First, by arguing that the Settlement Act effectuates a partial implied repeal of the IRA as to state jurisdiction on land taken into trust by the BIA. Second, by arguing that the statutes can be harmonized by reading the IRA narrowly and subject to the Settlement Act's provisions. Either approach gets to the same conclusion. Significantly, the generous rules of "Indian construction" do not apply in analyzing an implied repeal. See Passamaquoddy Tribe v. State of Maine, 75 F.3d 784, 790 (1st Cir. 1996) (the normal principles of implied repeal are applied in the Indian law context).

---

[25]    I do not challenge the majority's conclusion that the BIA may take the Parcel into trust, as the State previously permitted the Narragansetts to take the Settlement Lands into trust in 1988. But any new trust lands must also be explicitly made subject to the State's criminal and civil laws.

The parties and amici do an excellent job in acquainting the court with the many complexities of both the case and the issues inherent in "Indian law." However, the ultimate resolution of the case comes down to a very narrow question: In the specific context of the Tribe and State, what did Congress intend the Settlement Act to do?

The key provision is Section 1705, which is written far more broadly than the majority concludes.[26] In its first two provisions that section retroactively ratifies all the Tribe's prior land transfers anywhere in the United States and extinguishes the Tribe's aboriginal title in all such lands. See 25 U.S.C. § 1705(a)(1) & (2). More significantly, Section 1705 goes on to extinguish future land claims:

> (3) by virtue of the approval of a transfer of land or natural resources effected by this section, or an extinguishment of aboriginal title effected thereby, all claims against the United States, any State or subdivision thereof, or any other person or entity, by the Indian Corporation or any other entity presently or at any time in the past known as the Narragansett Tribe of Indians, or any predecessor or successor in interest, member of stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for

---

[26] Indeed, the very breadth of the language indicates more was contemplated by the parties than merely resolving an immediate dispute over title.

-72-

use and occupancy) shall be regarded as extinguished as of the date of the transfer.

Id. § 1705(a)(3). This provision obviously goes well beyond merely extinguishing aboriginal title (and claims based thereon), which was accomplished in the prior subsection. See id. § 1705(a)(2). This language forecloses any future "Indian" land claim of any type by the Tribe regarding land in Rhode Island (or anywhere in the United States, for that matter). Thus, Congress (and the parties) intended to resolve all the Tribe's land claims in the state once and for all.

The majority argues that Section 1705(a)(3) cannot be read so broadly; otherwise, the Tribe would be barred from asserting any land claims. See ante, at 42-43. But the majority disregards a significant factor -- the nature of the land claims that were barred. The legislative history of the Settlement Act specifically states that the "extinguishment of Indian land claims is limited to those claims raised by **Indians qua Indians**." H.R. Rep. 95-1453, at 1955 (1978) (emphasis added). As we recently stated, through the Settlement Act "the Tribe abandoned any right to an autonomous enclave, submitting itself to state law as a quid pro quo for obtaining the land that it cherished." Narragansett Tribe, 449 F.3d at 22. Thus, the Tribe would be free to assert any claim that any other landowner in Rhode Island could make under state law, but would be foreclosed from making claims based entirely on the Tribe's status as an Indian tribe. It is beyond

-73-

peradventure that asking to have land taken into trust by the BIA under the IRA to effect an ouster of state jurisdiction is a quintessential "Indian" land claim.[27]

Moreover, "Congress does not legislate in a vacuum," and among the matters that a court must consider in assessing a statute are general policies and pre-existing statutory provisions. Passamaquoddy Tribe, 75 F.3d at 789. The Settlement Act was enacted over 40 years after Section 465 of the IRA and, given the explicit acknowledgment of possible future recognition for the Tribe,[28] Congress was well aware of the IRA when enacting the Settlement Act. It is neither logical nor necessary to find that Congress enacted legislation effectuating this carefully calibrated compromise between three sovereigns, which required significant expenditures by both the federal government and the State, which provided a significant amount of land to the Tribe, and which provided for a delicate balancing of the parties' interests, only to permit the legislation to be completely subverted by subsequent agency action.

---

[27] The Tribe would still have the option of obtaining the State's consent to make certain Indian land claims -- such as the 1988 placement of the settlement lands in trust (subject to Rhode Island law) with the BIA.

[28] The Tribe's recognition by the BIA changed little, as this court has held that the jurisdictional grant to the State in the Settlement Act survived such recognition. See Narragansett Indian Tribe, 19 F.3d at 694-95.

-74-

On this score, the majority misses the exquisite irony that the Parcel was part of the lands originally claimed by the Tribe. It would be antithetical to Congress' intent to allow the Tribe to purchase a portion of the originally disputed lands that were the subject of the earlier lawsuits that ultimately led to the JMOU and Settlement Act, place it in trust with the BIA, and thereby create "Indian country" in direct contravention of the Settlement Act's prohibitions. For this same reason, the majority's attempt to distinguish our recent Narragansett Tribe opinion as pertaining only to the "Settlement Lands" is unpersuasive. See ante, at 37 n.11. By that reasoning, the Tribe could swap the Settlement Lands for adjacent land and undo any limitations contained in the Settlement Act. The Settlement Act cannot be reasonably construed to allow such absurd results.

Further, the Settlement Act was novel; it was the first statute resolving Indian land claims, premised upon the Nonintercourse Act, growing out of an out-of-court settlement negotiated by a tribe and the state/landowners. See H.R. 95-1453, at 1951 (1978). Indeed, it was expected to serve as a template for the resolution of other Eastern tribes' land claims under the Nonintercourse Act. See id.; see also Oneida Indian Nation, 125 S. Ct. at 1483-85 (discussing Nonintercourse Act and original 13 states' "pre-emptive right to purchase from the Indians"). In light of the fact that the Settlement Act was the first statute of

its kind, the majority's observation that subsequent statutes were more explicit in limiting certain aspects of the Secretary's power proves nothing. Elaborate statements regarding the Tribe's relationship with the BIA would have been unwarranted in the Settlement Act, given that the Tribe had not yet been recognized.

Moreover, that subsequent acts dealing with Eastern tribes made specific provision for the Secretary's ability to take land in trust for a tribe, see, e.g., 25 U.S.C. § 1771d(c) & (d) (Massachusetts Indian Claims Settlement); id. § 1724(d) (Maine Indian Claims Settlement); id. § 1754(b) (Connecticut Indian Claims Settlement), supports the conclusion that Congress anticipated no such result under the Settlement Act. Given that the State had full criminal and civil jurisdiction over its territory, that any potential jurisdictional issue concerning the Settlement Lands was specifically addressed, and that all future Indian land claims were barred, there would be no future land scenarios that Congress would need to address more specifically (as it did in the other acts).[29] As we have noted, "the Settlement Act, properly read, ensures that the State may demand the Tribe's compliance with state laws of general application." Narragansett Tribe, 449 F.3d at 26.

------

[29] In extinguishing the Tribe's aboriginal title in the Settlement Act, Congress was inspired by the Alaska Native Claims Settlement Act ("ANCSA"). See H.R. Rep. 95-1453, at 1951. As noted by the Supreme Court, the ANCSA sought to accomplish this goal "without creating a reservation system or lengthy wardship or trusteeship." Alaska v. Native Village of Venetie Tribal Govt., 522 U.S. 520, 524 (1998) (internal citation and quotation omitted).

-76-

There is also nothing novel about requiring the BIA to accept the Parcel into trust with restrictions. The BIA is authorized to take restricted interests in land into trust, see 25 U.S.C. § 465, and, in dealing with other tribes, Congress has specifically directed the BIA to take land into trust subject to a settlement act's provisions, see, e.g., id. § 1771d(d); id. § 1773b.

It is also worth noting that Congress acted promptly to preserve the State's jurisdiction over the Tribe's lands the last time this court challenged it. When this court held that the Tribe exercised sufficient jurisdiction and governmental authority over the Settlement Lands to invoke the Indian Regulatory Gaming Act, see Narragansett Tribe, 19 F.3d at 703, Congress promptly amended the Settlement Act to provide explicitly that the Settlement Lands are not "Indian lands" for purposes of that Act, see 25 U.S.C. § 1708(b).

I respectfully dissent.

**-Dissenting opinion follows-**

**SELYA**, **Senior Circuit Judge**, **dissenting.** I am in complete agreement with Judge Howard's cogent and articulate dissent, and I join it unreservedly. Nevertheless, I write separately to express my regret that, in taking far too narrow a view of the Settlement Act, the majority gives short shrift not only to the interests of the State of Rhode Island but also to the carefully calibrated arrangements crafted between the State and the Tribe.

We previously have made clear that the touchstone in resolving jurisdictional disputes between the State and the Tribe is the full effectuation of the parties' intent. See Narrangansett Indian Tribe v. Rhode Island, 449 F.3d 16, 22, 25 (1st Cir. 2006) (en banc). Yet, today, the majority sets aside the parties' intent in favor of a wooden reading of one subsection of the Settlement Act. See ante at 37 ("By its terms, section 1708(a) applies state law only to the 1800 acres of 'settlement lands.' The Parcel is not part of the settlement lands.").

Despite the artful draftmanship of the majority opinion, the provision on which it relies cannot be wrested from its historical context and read in a vacuum. The Settlement Act, when taken together with the extinguishment of all Indian claims referable to lands in Rhode Island, the Tribe's surrender of its right to an autonomous enclave, and the waiver of much of its sovereign immunity, see Narrangansett Indian Tribe, 449 F.3d at 22,

-78-

24-25, suggests with unmistakable clarity that the parties intended to fashion a broad arrangement that preserved the State's civil, criminal, and regulatory jurisdiction over any and all lands within its borders.  Therefore, the Settlement Act logically and equitably should be read to prohibit any unilateral action that would upset this hard-bargained and delicate jurisdictional balance.

The Secretary's taking of an after-acquired parcel into an unrestricted trust is just such an event.  It strains credulity to surmise, as does the majority, that the State would have made such substantial concessions — including the transfer, free and clear, of 1800 acres of its land — while leaving open the gaping loophole that today's decision creates.

The majority admits that this case is "in many ways a proxy for the State's larger concerns about its sovereignty," ante at 4, including the State's understandable worry that the Tribe will use this parcel (or future parcels that might be acquired and placed into trust) for activities that would be forbidden under State law and anathema to a majority of the State's citizens.  At oral argument, the Secretary of the Interior and the Bureau of Indian Affairs appeared to disclaim any vestige of responsibility for the State's concerns.  Despite this disclaimer and "the genuineness of the State's sense that its bargain has been upset," ante at 47, the majority turns its back on the State.

-79-

In my view, this is error — and error of the most deleterious kind. The majority, without anything approaching sufficient justification, is engaging in pointless literalism and forcing the State to rely on the faint velleity that the Secretary will use caution in the exercise of his responsibilities in connection with the Parcel. While "hope" is the official motto of Rhode Island, the State should not be force-fed hope in place of rights for which it has bargained.

As Indian tribes evolve in modern society, old legal rules tend to blur. The controversy that divides our court today is vexing and of paramount importance to both the State and the Tribe. Thus, the issue — as well as the underlying principles of Indian law — doubtless would benefit from consideration by the Supreme Court. That is a consummation devoutly to be wished. In the meantime, however, there is too much at stake to allow the Tribe, with the contrivance of the Secretary's taking the Parcel into trust, to walk away from an arrangement that it helped to fashion and from which it has benefitted over the years.

I respectfully dissent.